UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MICHAEL KUEBLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VECTREN CORPORATION, CARL L. CHAPMAN, DERRICK BURKS, JAMES H. DEGRAFFENREIDT, JR., JOHN D. ENGELBRECHT, ANTON H. GEORGE, ROBERT G. JONES, PATRICK K. MULLEN, R. DANIEL SADLIER, MICHAEL L. SMITH, TERESA J. TANNER, and JEAN L. WOJTOWICZ,<br><br>Defendants. | Case No. 3:18-cv-113-<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>1. VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9<br><br>2. VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 |

Michael Kuelber ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1. This is a class action brought by Plaintiff on behalf of himself and the other ordinary shareholders of Vectren Corporation ("Vectren" or the "Company"), except Defendants (defined below) and their affiliates, against Vectren and the members of Vectren's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Vectren by CenterPoint Energy, Inc. ("CenterPoint").

2. On April 21, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the CenterPoint, pursuant to which, Vectren shareholders will receive $72.00 in cash for each share of common stock they own (the "Merger Consideration").

3. On, June 18, 2018, the Board authorized the filing of a materially incomplete and misleading proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The Proposed Transaction is expected to close no later than the first quarter of 2019, with the shareholder vote occurring before then.

4. While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the Proxy, they have failed to disclose material information that is necessary for stockholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's financial projections; (ii) the valuation analyses performed by the Company's financial advisor Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), in support of its fairness opinions; and (iii) the *Background of the Merger*.

5. It is imperative that the material information omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

6. For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps

to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Vectren shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Vectren is incorporated in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

10. Plaintiff is, and has been at all relevant times, the owner of Vectren common stock and held such stock since prior to the wrongs complained of herein.

11. Defendant Vectren is an Indiana Corporation with its principle executive offices located at One Vectren Square, 211 N.W. Riverside Drive, Evansville, Indiana 47708.  Vectren is

an energy holding company of wholly owned subsidiary, Vectren Utility Holdings, Inc. ("VUHI"), which serves as the intermediate holding company for three public utilities: Indiana Gas Company, Inc. ("Indiana Gas"), Southern Indiana Gas and Electric Company ("SIGECO"), and Vectren Energy Delivery of Ohio, Inc. ("VEDO"). Vectren's common stock trades on the NASDAQ under the symbol "VVC."

12. Individual Defendant Carl L. Chapman is a director of Vectren, the President and Chief Executive Officer of the Company, and the Chairman of the Board.

13. Individual Defendant Derrick Burks is, and has been at all relevant times, a director of Vectren.

14. Individual Defendant James H. DeGraffenreidt, Jr. is, and has been at all relevant times, a director of Vectren.

15. Individual Defendant John D. Engelbrecht is, and has been at all relevant times, a director of Vectren.

16. Individual Defendant Anton H. George is, and has been at all relevant times, a director of Vectren.

17. Individual Defendant Robert G. Jones is, and has been at all relevant times, a director of Vectren.

18. Individual Defendant Patrick K. Mullen is, and has been at all relevant times, a director of Vectren.

19. Individual Defendant R. Daniel Sadlier is, and has been at all relevant times, a director of Vectren.

20. Individual Defendant Michael L. Smith is, and has been at all relevant times, a director of Vectren.

21. Individual Defendant Teresa J. Tanner is, and has been at all relevant times, a director of Vectren.

22. Individual Defendant Jean L. Wojtowicz is, and has been at all relevant times, a director of Vectren.

23. The defendants identified in paragraphs 11-20 are collectively referred to as the "Defendants".

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Vectren common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

25. This action is properly maintainable as a class action for the following reasons:

(a) The Class is so numerous that joinder of all members is impracticable. As of the close of business on June 13, 2018, Vectren ad approximately 63 million common shares outstanding.

(b) The holders of these shares are believed to be geographically dispersed through the United States;

(c) There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

      i. Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

    ii. Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii. Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Transaction as presently anticipated.

  (d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

  (e) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

  (f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**I. Background and the Proposed Transaction**

  26. Vectren incorporated on June 10, 1999, is an energy holding company. The Company segregates its operations into groups, including the Utility Group, the Nonutility Group, and Corporate and Other. The Company's subsidiary, Vectren Utility Holdings, Inc. (Utility Holdings or VUHI), serves as the intermediate holding company for three public utilities: Indiana Gas Company, Inc. (Indiana Gas), Southern Indiana Gas and Electric Company (SIGECO) and Vectren Energy Delivery of Ohio, Inc. (VEDO). The Company, through Vectren Enterprises Inc. (Enterprises), is involved in non-utility activities in two primary business areas: Infrastructure

Services and Energy Services. Infrastructure Services provides underground pipeline construction and repair services. Energy Services provides energy performance contracting and sustainable infrastructure, such as renewables, distributed generation, and combined heat and power projects.

27. CenterPoint Energy, Inc., incorporated on August 31, 2001, is a public utility holding company. The Company's operating subsidiaries own and operate electric transmission and distribution facilities, and natural gas distribution facilities, and own interests in Enable Midstream Partners, LP (Enable). The Company's segments include Electric Transmission & Distribution, Natural Gas Distribution, Energy Services, Midstream Investments and Other Operations. Its Electric Transmission & Distribution segment provides electric transmission and distribution services to retail electric providers (REPs). Its Natural Gas Distribution segment offers intrastate natural gas sales to and natural gas transportation and distribution for residential, commercial and industrial customers. Its Energy Services segment includes non-rate regulated gas sales to, and transportation and storage services for, commercial and industrial customers. Its Midstream Investments segment includes equity investment in Enable that owns, operates and develops natural gas and crude oil assets. Its Other Operations segment includes office buildings and other real estate used in its business operations and other corporate operations, which support all of its business operations.

28. On April 23, 2018, Vectren and CenterPoint issued a joint press release to announce the Proposed Transaction stating as follows:

**CenterPoint Energy and Vectren to Merge**
*Advances strategy to become a leading U.S. energy delivery, infrastructure and services company*

- **Vectren shareholders to receive $72.00 in cash for each share of Vectren common stock**

7

- **Complementary businesses to operate regulated utility businesses in eight states, have combined footprint in nearly 40 states, and serve over 7 million customers**

- **Combined company to be named CenterPoint Energy with corporate headquarters in Houston; Vectren will become a CenterPoint Energy company with the combined company's natural gas utilities operations and the Indiana electric operation to be headquartered in Evansville, Ind.**

- **CenterPoint Energy expects to maintain annual guidance basis EPS growth target of 5 to 7 percent in 2019 and 2020, excluding any one-time charges related to the merger**

- **Transaction anticipated to be funded by combination of equity and debt; capital structure and resulting credit metrics expected to support solid investment grade credit quality**

**Houston and Evansville, Ind. – April 23, 2018 –** CenterPoint Energy, Inc. (NYSE: CNP) and Vectren Corporation (NYSE: VVC) today announced they have entered into a definitive merger agreement to form a leading energy delivery, infrastructure and services company serving more than 7 million customers across the United States.

Under the terms of the agreement, which have been unanimously approved by both CenterPoint Energy's and Vectren's Boards of Directors, Vectren shareholders will receive $72.00 in cash for each share of Vectren common stock. CenterPoint Energy will also assume all outstanding Vectren net debt.

"This merger represents a significant step toward our vision to lead the nation in delivering energy, service and value. By combining our two highly complementary companies, we are creating an energy delivery, infrastructure and services leader that will drive value for our shareholders and customers, while enhancing growth opportunities for our businesses," said Scott M. Prochazka, president and chief executive officer of CenterPoint Energy. "From the evolution of customer expectations to the development of innovative technologies, this is a time of extraordinary opportunity for our industry. As a combined company, we will continue to focus on a future that benefits our customers, employees, communities and shareholders."

-more-

Vectren Chairman, President and Chief Executive Officer Carl L. Chapman said, "With CenterPoint Energy, we've found the right partner to begin the next chapter for Vectren and our family of companies. They share the same core values and dedication to the communities they serve, which is evidenced by the commitments

they have made to our employees, philanthropic outreach, and Evansville, Ind., our home, where CenterPoint Energy will locate the newly combined company's natural gas utility operations headquarters. Together, we will be a stronger, more competitive company that will be well-positioned to continue to provide value for our stakeholders in the years to come."

**The Combined Company**

The combined company is expected to have electric and natural gas delivery operations in eight states with assets totaling $29 billion and an enterprise value of $27 billion.

Headquartered in Houston, CenterPoint Energy has significant natural gas operations in Arkansas, Louisiana, Minnesota, Mississippi, Oklahoma and Texas, serving more than 3.4 million customers. The company also delivers electricity to more than 2.4 million customers in the greater Houston area. CenterPoint Energy's competitive natural gas sales and services business serves more than 100,000 customers in 33 states. The company employs nearly 8,000.

Headquartered in Evansville, Ind., Vectren provides natural gas to more than 1 million customers in Indiana and Ohio, and electricity to 145,000 customers in Indiana. Vectren's non-utility businesses include Infrastructure Services (VISCO), which provides underground pipeline construction, repair and replacement services, and Energy Services (VESCO), which offers performance contracting services and renewable energy project development. CenterPoint Energy intends to continue operating VISCO out of Indianapolis, Ind., and VESCO out of Newburgh, Ind. (near Evansville). Vectren also owns and operates power generation assets in Indiana with a production capacity of 1,248 megawatts. The company employs approximately 5,500.

Following the completion of the merger, the combined company expects to execute a unified business strategy focused on the safe and reliable delivery of electricity, natural gas and related services to customers.

**Advantages and Benefits**

By combining their experienced professionals and complementary businesses, CenterPoint Energy and Vectren believe they will create a strong, diversified company with compelling advantages and benefits:

- Opportunities to leverage combined talent, skills and resources to enhance already award-winning customer service levels;

- World-class workforce and financial resources to provide sustainable and innovative energy solutions;

- Ability to share best practices for service, reliability and technology across the combined company's footprint;

- Opportunities to leverage and expand competitive energy-related services across a larger U.S. footprint; and

- Combined company scale to create opportunities for long-term efficiencies in the delivery of services to customers.

**Earnings Impact**

With the merger, CenterPoint Energy expects to maintain an annual guidance basis EPS growth target of 5 to 7 percent in 2019 and 2020, excluding any one-time charges related to the merger.

**Leadership**

At the closing of the transaction, Scott M. Prochazka will serve as president and CEO of the combined company. The full executive team for the combined company will be announced prior to or in conjunction with the closing of the merger. The natural gas utilities operations of the combined company, as well as that businesses' lead executive, will be headquartered in Evansville. Additionally, CenterPoint Energy will establish a chief business officer for Vectren's electric business who will directly report to CenterPoint Energy's CEO and spearhead southwestern Indiana's electric grid modernization and generation transition initiatives recently underway. In addition to utility field employees, CenterPoint Energy will retain key operational activities in support of the utilities in Evansville.

Integration teams co-led by leaders from each company are in the process of being established and will be centered in Evansville. These teams will be responsible for identifying best practices and facilitating the integration of the two companies..

## II. The Proxy Is Materially Incomplete and Misleading

29. On June 18, 2018, Vectren filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material

information that is necessary for the Company's shareholders to cast an informed vote regarding Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

30. The First, the Proxy fails to provide unlevered free cash flow projections[1] for Vectren. Unlevered free cash flows were utilized by BofA Merrill Lynch in their valuation calculations, including their discounted cash flow analyses, and are material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the expected unlevered free cash flows? Without unlevered free cash flow projections, the Company's shareholders were not able to answer this question and assess the fairness of the Merger Consideration.

31. The omission of the above-referenced projections renders the financial projections included in the Proxy materially incomplete and misleading. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

---

[1] Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

32. With respect to BofA Merrill Lynch's *Selected Publicly Traded Companies Analysis* and *Selected Precedent Transactions Analysis* the Proxy fails to disclose the individual multiples for each company and transaction utilized in the analysis. The omission of these multiples renders the summary of the analyses and the corresponding implied equity value reference ranges materially misleading. A fair summary of a companies analysis requires the disclosure of the individual multiples for each company; merely providing the high and low values that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price range.

33. With respect to the BofA Merrill Lynch's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the various discount rate ranges utilized, including the value of WACC components; (ii) the value of the net debt used to adjust the enterprise values; and (iii) the actual terminal values calculated.

34. These key inputs are material to Vectren shareholders, and their omission renders the summary of the BofA Merrill Lynch's *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

35. Finally, with respect to the *Background of the Merger*, the Proxy states that each of six potential bidders entered into a confidentiality agreement with Vectren that contained a standstill provision, but fails to disclose whether such agreements contained a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect. Such information is material to Vectren stockholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The failure to disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. That's not true. If those confidentiality agreements contained DADW provisions, they could only make a superior proposal by breaching the agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this information renders the descriptions of the confidentiality agreements the Company entered into materially incomplete and misleading. Any reasonable shareholder would deem the fact that the most likely potential topping bidder in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information

36. In sum, the omission the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

37. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

38. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

39. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

14

40. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

41. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) the Company's financial projections; (ii) the valuation analyses performed by the BofA Merrill Lynch in support of its fairness opinion; and (iii) the *Background of the Merger*.

42. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

43. Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for Vectren and the details surrounding discussions with other interested parties and the BofA Merrill Lynch. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of

the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review The BofA Merrill Lynch's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

44. Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of Vectren's financial projections.

45. Vectren is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

46. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and will deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed Transaction. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

47.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.     The Individual Defendants acted as controlling persons of Vectren within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of Vectren, and participation in and/or awareness of the Vectren's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Vectren, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

49.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

50.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Vectren, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Proxy.

51.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

52.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

53.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

54.   Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating,

or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 18, 2018                    Respectfully submitted,

**OF COUNSEL**                          **LOCAL COUNSEL**

**MONTEVERDE & ASSOCIATES PC**          /s/ Jason A. Shartzer
Juan E. Monteverde                      Jason A. Shartzer, Atty. No. 23989-49
The Empire State Building               **SHARTZER LAW FIRM, LLC**
350 Fifth Avenue, Suite 4405            156 E. Market Street
New York, NY 10118                      10th Floor, Suite 1000
Tel.: (212) 971-1341                    Indianapolis, IN 46204
Fax: (212) 202-7880                     (317) 969-7600
Email: jmonteverde@monteverdelaw.com    (317) 969-7650 Fax
                                        Email: jshartzer@shartzerlaw.com

*Counsel for Plaintiff*                 *Counsel for Plaintiff*