# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MICHAEL KUEBLER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> VECTREN CORPORATION, CARL L. CHAPMAN, DERRICK BURKS, JAMES H. DEGRAFFENREIDT, JR., JOHN D. ENGELBRECHT, ANTON H. GEORGE, ROBERT G. JONES, PATRICK K. MULLEN, R. DANIEL SADLIER, MICHAEL L. SMITH, TERESA J. TANNER, and JEAN L. WOJTOWICZ, <br><br> Defendants. | Cause No. 3:18-cv-00113 <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> 1. **VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9** <br><br> 2. **VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Lead plaintiffs Michael Kuebler, James Danigelis, and Michael Nisenshal ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, allege the following upon information and belief (including the investigation of counsel, consultation with a financial expert, and review of publicly-available information), except as to those allegations pertaining to Plaintiffs, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiffs on behalf of themselves and the other common shareholders of Vectren Corporation ("Vectren" or the "Company"), except Defendants (defined below) and their affiliates, against Vectren and the members of Vectren's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a),

and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with CenterPoint Energy, Inc.'s ("CenterPoint") acquisition of Vectren (the "Merger").

2. On April 21, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with CenterPoint, pursuant to which Vectren shareholders will receive $72.00 in cash for each share of common stock they own (the "Merger Consideration"). On, July 16, 2018, the Board authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. While Defendants touted the fairness of the Merger Consideration to the Company's stockholders in the Proxy, they failed to disclose material financial information that was necessary for stockholders to properly recognize the inadequacy of the Merger Consideration, thereby rendering certain statements in the Proxy misleading.

3. Rule 14a-9(a) prohibits proxy statements from: (i) containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact; and (ii) omitting any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading. 17 C.F.R. § 240.14a-9(a).

4. When corporate actors voluntarily elect to speak regarding projections and valuation-related information, they assume an obligation to do so in a complete and accurate manner. When it comes to disclosing projections and valuation information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose incomplete half-truths. If one speaks on a topic, he is bound not only to state the truth, but also

not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.  The selective disclosure of projections and valuation information is inherently misleading because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction.  Disclosing only a subset of available financial information, while withholding another subset of distinct financial information that alters the overall valuation picture created by the disclosed numbers, is misleading.

5.      Here, the Defendants withheld two pieces of critical financial information, without which, it was impossible for Vectren shareholders to properly value their shares.  First, the Proxy entirely omitted projections for the standalone unlevered, after-tax free cash flows that Vectren was forecasted to generate during fiscal years 2018 through 2027, which were based on Company management's forecasts (the "Cash Flow Projections").  *See* Proxy at 37.  Second, the Proxy omitted the financial projections for each of Vectren's three main business lines—gas, electric, and non-regulated—on an individual basis (the "Business Segment Projections").  The Business Segment Projections were analyzed by the Company's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), and formed the basis for its valuation analyses, but were withheld from shareholders.  Indeed, it would have been impossible for BofA Merrill Lynch to perform its valuation analyses in the manner that it did without Business Segment Projections as opposed to the consolidated projections that were included on page 40 of the Proxy ("Consolidated Projections").  *See* Summary of Initial Findings of M. Travis Keath (Exhibit 1 hereto) at ¶¶ 21-28.

6.      The omission of the Cash Flow Projections and the Business Segment Projections rendered the following two portions of the Proxy misleadingly incomplete: (i) the summary of the

Discounted Cash Flow Analysis ("DCF") performed by BofA Merrill Lynch on pages 37-38 of the Proxy; and (ii) the summary of Vectren's Consolidated Projections on page 40 of the Proxy.

7.     On August 28, 2018, Vectren held a special meeting of shareholders to vote on the Merger.  The Merger was narrowly approved by a mere 61% of the Company's outstanding shares. The Merger is currently expected to close in the first quarter of 2019.  Shareholders were not adequately informed when they voted to approve the Merger, because the Proxy omitted the material information and contained the misleading statements discussed herein, which impeded shareholders from recognizing the inadequacy of the Merger Consideration.  The materially incomplete and misleading Proxy was an essential link in the forthcoming Merger, as the Merger could not be consummated without shareholder approval, which in turn could not have been obtained without the misleading Proxy.

8.     For these reasons, as set forth in detail herein, Plaintiffs assert claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiffs seek to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiffs allege violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Vectren is incorporated in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiffs are, and have been at all relevant times, the owners of Vectren common stock and held such stock since prior to the wrongs complained of herein.

13.     Defendant Vectren is an Indiana Corporation with its principal executive offices located at One Vectren Square, 211 N.W. Riverside Drive, Evansville, Indiana 47708.  Vectren is an energy holding company of its wholly owned subsidiary, Vectren Utility Holdings, Inc., which serves as the intermediate holding company for three public utilities: Indiana Gas Company, Inc., Southern Indiana Gas and Electric Company, and Vectren Energy Delivery of Ohio, Inc. Vectren's common stock trades on the NASDAQ under the symbol "VVC."

14.     Individual Defendant Carl L. Chapman is a director of Vectren, the President and Chief Executive Officer of the Company, and the Chairman of the Board.

15.     Individual Defendant Derrick Burks is, and has been at all relevant times, a director of Vectren.

16.     Individual Defendant James H. DeGraffenreidt, Jr. is, and has been at all relevant times, a director of Vectren.

17.     Individual Defendant John D. Engelbrecht is, and has been at all relevant times, a director of Vectren.

18.     Individual Defendant Anton H. George is, and has been at all relevant times, a director of Vectren.

19.     Individual Defendant Robert G. Jones is, and has been at all relevant times, a director of Vectren.

20.     Individual Defendant Patrick K. Mullen is, and has been at all relevant times, a director of Vectren.

21.     Individual Defendant R. Daniel Sadlier is, and has been at all relevant times, a director of Vectren.

22.     Individual Defendant Michael L. Smith is, and has been at all relevant times, a director of Vectren.

23.     Individual Defendant Teresa J. Tanner is, and has been at all relevant times, a director of Vectren.

24.     Individual Defendant Jean L. Wojtowicz is, and has been at all relevant times, a director of Vectren.

25.     The defendants identified in paragraphs 13-24 are collectively referred to as the "Defendants".

## SUBSTANTIVE ALLEGATIONS

### I.     The Flawed Sales Process and Inadequate Merger Consideration

26.     Prior to announcing the Merger on April 23, 2018, Defendants conducted a flawed strategic review process that failed to obtain fair consideration for Vectren's common shareholders.

27.     First, Defendants required interested bidders to enter into confidentiality and standstill agreements.  The standstill component of such agreements obligate bidders to refrain

from various actions that would enable them to make a superior offer directly to a company's shareholders.  There is no indication that any of the interested bidders were released from their standstill obligations upon the announcement of the Merger, as is customary when a board is truly trying to maximize shareholder value.

28.     Furthermore, on February 21, 2018, certain bidders submitted indications of interest that were higher than the $72.00 per share Merger Consideration the Defendants ultimately accepted.  Specifically, an entity referred to in the Proxy as "Bidder A" proposed a price of $72.50 per share with up to 83% of the consideration in cash and the remainder in common stock of Bidder A, and an entity referred to in the Proxy as "Bidder B" submitted an indication of interest at an all cash price range of $73.00 to $75.00.

29.     Thereafter, on April 6, 2018, consistent with prior instructions from BofA Merrill Lynch regarding the submission of definitive bids, CenterPoint Energy and Bidder A each submitted definitive offers to acquire the Company.  Bidder A offered to acquire the Company for $70.50 per share with a consideration mix of 83% cash and 17% common stock of Bidder A.  The common stock portion of the consideration included in Bidder A's proposal was subject to a collar of plus or minus 5.0% based on fluctuations in the price of Bidder A's common stock between the date a merger agreement was signed and closing. CenterPoint Energy proposed acquiring the Company for $70.00 per share, all cash.

30.     Defendants proceeded to focus on negotiating terms of the Merger Agreement that directly inured to their benefit rather than the Company's public shareholders.  For example, on April 10, 2018, counsel for Defendants sent revised drafts of the merger agreement to each of CenterPoint Energy and Bidder A.  In the revised draft sent to CenterPoint Energy, the Company counter-proposed that all performance-based equity awards be cashed out at the greater of target

and actual performance.  Defendants also proposed that CenterPoint Energy appoint at least one former Company director to CenterPoint Energy's board of directors upon closing of the Merger.

31.     On April 11, 2018, CenterPoint's Chief Executive Officer indicated to Mr. Chapman that CenterPoint was willing to keep the headquarters of the combined company's gas operations in Evansville for a minimum of three years.

32.     Also on April 11, 2018, the Company received a revised draft of Bidder A's proposed form of merger agreement from Bidder A's counsel.  In this draft, Bidder A improved the collar on the stock price component of its offer from 5.0% to 7.5%.  Bidder A also accepted Vectren's proposed 2.5% termination fee payable by the Company and the 4% fee payable by Bidder A in the event of a regulatory failure.

33.     On April 12, 2018, Bidder A sent the Company a letter indicating that it was prepared to increase the price of its proposal to $71.00 per share. The consideration mix was unchanged.

34.     On April 14 and 15, 2018, representatives of BofA Merrill Lynch spoke with CenterPoint Energy and Bidder A.  BofA Merrill Lynch requested that each bidder present its "best and final" proposal by April 16, 2018 and indicated that the Company intended to select a preferred bidder based on the revised proposals.  That representation turned out to be false, as the Defendants authorized their representatives to continue negotiating with CenterPoint Energy after the final bid deadline, while they made no further efforts to engage with Bidder A to improve its offer.

35.     Specifically, on April 16, 2018, CenterPoint Energy and Bidder A submitted revised offers to acquire the Company.  Bidder A continued to offer $71.00 per share, with 83% of the consideration in cash and 17% in common stock of Bidder A.  The stock portion of the consideration was subject to a 7.5% collar based on fluctuation in the price of Bidder A's common

stock between the date a merger agreement was signed and closing.  CenterPoint Energy offered $71.50 per share, with the consideration being all cash. CenterPoint Energy also submitted a revised draft of the merger agreement with its revised bid.  In this draft, CenterPoint Energy proposed revised terms with respect to compensation and equity awards for Company officers and employees.

36.     Despite the fact that the Defendants had set April 16th as the "best and final offer" deadline, and that they explicitly recognized "the terms of the merger agreement proposed by CenterPoint Energy were not as favorable as those proposed by Bidder A," presumably because of the value of the stock-component of Bidder A's offer which would have enabled Vectren shareholders to maintain an equity interest in the combined company and reap the associated benefits, the Defendants authorized their representatives to continue discussions with CenterPoint Energy after the final bid deadline and made no further efforts to engage with Bidder A.  In other words, even though Bidder A's "best and final" proposal had been deemed more favorable, the Defendants proceeded to continue negotiations with CenterPoint after the final bid deadline they had set.  The "best and final" offer deadline was therefore illusory, and Bidder A was never given an opportunity to improve its "best and final" bid further, while CenterPoint Energy was.

37.     Specifically, on April 18, 2018, two days after the illusory "best and final" bid deadline, a representative of BofA Merrill Lynch spoke to William Roger, the Chief Financial Officer of CenterPoint Energy.   At the direction of Company management, the BofA Merrill Lynch representative informed Mr. Rogers that the Company would like to move forward on a transaction with CenterPoint Energy, provided that acceptable price and other terms could be negotiated.  Defendants agreed to continue negotiations and move forward with a deal with CenterPoint Energy despite the fact that the BofA Merrill Lynch representative indicated that the

terms of the merger agreement proposed by CenterPoint Energy were not as favorable as those proposed by Bidder A.   The BofA representatives indicated that the Company would like CenterPoint Energy to consider increasing the price of its proposal to he bare minimum price the Defendants were willing to accept, $72.00 per share.   CenterPoint's representatives quickly indicated that they would move forward at the bare minimum $72.00 price, and the parties moved quickly to finalize the Merger Agreement at that price.   That same day, a representative from BofA Merrill Lynch spoke with the chief executive officer of Bidder A to inform him that the Board had instructed management to move forward with another bidder, and Bidder A was not given an opportunity to improve its bid further—only CenterPoint Energy was given that opportunity after the illusory "best and final offer" deadline.   And, given the fact that Bidder A was bound by a standstill provision, it was unable to make a better offer directly to the Company's shareholders.

38.     Also on April 18, 2018, BofA Merrill Lynch provided to Company management a disclosure form concerning BofA Merrill Lynch's material relationships with CenterPoint Energy, which noted that (i) certain senior members of the BofA Merrill Lynch financial advisory deal team working with the Company are also members of the coverage team for CenterPoint Energy, including the relationship manager of the CenterPoint Energy coverage team, and (ii) certain members of the financial advisory team working with the Company have provided advisory services to CenterPoint Energy unrelated to the Company from time to time.

39.     On April 21, 2018, Scott M. Prochazka, CenterPoint Energy's President and Chief Executive Officer, called Mr. Chapman to discuss the remaining open issues in the merger agreement. Following this discussion and after additional discussions among the Company's and CenterPoint Energy's counsel, Baker Botts provided to CenterPoint Energy and its counsel a revised form of merger agreement that reflected the resolution of all open items in the merger

agreement. This draft provided that performance-based equity awards would be cashed out at the greater of target and actual performance, other than 2019 grants, if any were issued, which would be cashed out on a pro-rated basis based on target performance.

40.     Later that day, the Board met at a special meeting to consider the final terms of the offer from CenterPoint Energy.  Members of Company senior management and representatives from BofA Merrill Lynch and legal counsel were present during parts of the meeting. Mr. Chapman and other members of Company senior management reviewed with the Board the final terms of the transaction that had been negotiated with CenterPoint Energy, including the price of $72.00 per share in cash and the protections and commitments for employees.  Such employee commitments included that the combined company's natural gas utilities operations would be headquartered in Evansville for at least three years, a to-be-determined executive would be appointed to oversee gas utility operations, and a to-be-determined chief business officer for the Company's electric business would be appointed and based in Evansville.

41.     Following the presentation by Company management, BofA Merrill Lynch reviewed the financial aspects of the transaction and provided the Board with an update of its valuation analysis with respect to the Company. BofA Merrill Lynch then delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion dated April 21, 2018, to the effect that, as of that date and based on and subject to various assumptions and limitations described in its opinion, the merger consideration to be received by holders of Company common stock was fair, from a financial point of view, to such holders.  Following receipt of BofA Merrill Lynch's fairness opinion and further discussion, the Board unanimously adopted the merger agreement and approved the Company's execution, delivery and performance of the merger agreement and the consummation of the transactions contemplated by the merger agreement, and

resolved to recommend that the shareholders of the Company approve the merger agreement and directing that the merger agreement be submitted to the Company's shareholders for approval at a duly held meeting of the Company's shareholders for such purpose.

## II.     BofA Merrill Lynch's Conflicts of Interest Made it Even More Critical That Vectren Shareholders Be Provided with the Material Financial Projections Necessary to Understand and Assess Its Valuation Analyses, But They Were Not

42.     In addition to the above-referenced conflicts of interest, BofA Merrill Lynch has or will receive approximately $32.3 million in connection with the Merger, including $1 million of which was payable upon the delivery of its fairness opinion, approximately $3.23 million of which was payable upon execution of the Merger Agreement, approximately $6.46 million of which became payable upon receipt of the Company shareholder approval, and the remaining portion of which is contingent upon consummation of the Merger.  Additionally, BofA Merrill Lynch had strong, pre-existing ties to both Vectren and CenterPoint Energy.  From April 1, 2016 through March 31, 2018, BofA Merrill Lynch and its affiliates derived aggregate revenues from Vectren and its affiliates of approximately $5 million.  In addition, BofA Merrill Lynch and its affiliates previously provided, and at the time they rendered the fairness opinion were providing financial services to CenterPoint Energy and had or may receive compensation for the rendering of such services, including (i) having acted or acting as co-lead arranger and joint bookrunner for, and as a lender (including in some instances as letter of credit lender) under, certain credit facilities of CenterPoint Energy and certain of its affiliates, (ii) having acted as joint bookrunner on several debt offerings undertaken by affiliates of CenterPoint Energy, and (iii) having provided or providing certain treasury and trade management services and products to CenterPoint Energy and certain of its affiliates. From April 1, 2016 through March 31, 2018, BofA Merrill Lynch and its

affiliates derived aggregate revenues from CenterPoint Energy and its affiliates of approximately $10 million for investment and corporate banking services.

43.     In other words, BofA Merrill Lynch faced significant conflicts of interest in opining on the purported "fairness" of the Merger Consideration to Vectren's public shareholders.  It was therefore imperative that Vectren shareholders be provided with the financial information necessary to properly assess BofA Merrill Lynch's valuation analyses, but, as set forth herein, they were not.

**III.   The Defendants, Vectren's Executive Officers and Management had Significant Personal Reasons for Agreeing to a Merger with CenterPoint, Which Caused Their Interests to Diverge from the Company's Public Shareholders**

44.     The Individual Defendants and other Vectren executives also had significant personal financial reasons for pursuing a merger rather than continuing with Vectren's stand-alone business plan, including benefits derived from the treatment of their equity awards, fiscal year bonuses, change in control agreements, and deferred compensation plans.  The estimated value of the benefits that Vectren's non-employee directors will receive in respect of their stock unit awards in connection with the Merger is $1,139,040 in the aggregate.

45.     First, each stock unit of the Company subject to time-based vesting under the Company's stock plan that is unvested and outstanding immediately prior to the effective time of the merger (other than the stock units granted in May 2018 or the 2019 fiscal year) will vest in full and be cancelled and in exchange therefor, former holders of stock units will be entitled to receive a cash payment in an amount equal to the cash consideration payable pursuant to the merger *plus* the amount of any unpaid dividend equivalents associated with such stock units as of the effective time of the merger, *less* withholding with respect to applicable taxes. Such cash payment will be made within five business days after the closing date.

46.     Additionally, each performance unit of the Company subject to performance-based vesting under its stock plan for which the applicable performance period has ended prior to the effective time of the merger that is outstanding and unpaid prior to the effective time ("unpaid performance units") will be cancelled and in exchange therefor, former holders of our unpaid performance units will be entitled to receive a cash payment in an amount equal to the cash consideration payable pursuant to the merger, with the number of vested unpaid performance units of the Company as of the effective time of the merger to equal the number determined in accordance with the performance criteria and adjusted for dividends as provided in the applicable award agreement, *less* withholding with respect to applicable taxes.

47.     Furthermore, each performance unit of the Company subject to performance-based vesting under its  stock plan, other than unpaid performance units or any performance units that may be granted in the 2019 fiscal year, that is outstanding and unvested immediately prior to the effective time of the merger will vest in full and be cancelled and in exchange therefor, the former holders of such performance units will be entitled to receive a cash payment in an amount equal to the cash consideration payable pursuant to the merger, with the number of vested performance units as of the effective time of the merger to equal the greater of the target award and the number determined in accordance with the performance criteria provided in the applicable award agreement as if the performance period ended on the last business day immediately preceding the closing date and adjusted for dividends as provided in the applicable award agreement, *less* withholding with respect to applicable taxes. Such cash payment will be made within five business days after the closing date.

48.     Following the date of the merger agreement, the Defendants amended the Company's stock plan to provide that each outstanding May 2018 or 2019 stock unit will be

cancelled upon the consummation of the Merger and in exchange therefor, the holders of such May 2018 or 2019 stock units will be entitled to receive a cash payment in an amount equal to the cash consideration payable pursuant to the Merger, with the number of vested May 2018 or 2019 stock units to be based on the target award pro-rated based upon the closing date and adjusted for dividends as provided in the applicable award agreement (with any unvested portion cancelled), *less* withholding with respect to applicable taxes. Such cash payment will be made within five business days after the closing date. The May 2018 stock units will be prorated based on the number of days between the grant date and the closing date divided by 365.  The 2019 stock units will be prorated based on the number of days between the grant date and the closing date divided by 1095.

49.     Additionally, immediately prior to the effective time of the Merger, each contractual right to receive the value of a share of the Company's common stock under its nonqualified deferred compensation plan that is outstanding immediately prior to the effective time of the Merger will be cancelled and in exchange therefor, the holders of such contractual rights will be entitled to receive a cash payment in an amount equal to the cash consideration payable pursuant to the Merger, *less* withholding with respect to applicable taxes.  Such cash payment will be made on the date that it would otherwise occur under our applicable benefit plan or applicable election form under our benefit plan.

50.     The table below sets forth for each of the Company's named executive officers estimates of the amounts of compensation that are based on or otherwise relate to the Merger. Certain amounts will or may become payable on a qualifying termination of employment following the Merger (*i.e.*, on a "double-trigger" basis). Certain other benefits will become payable upon the occurrence of the closing of the merger (*i.e.*, on a "single-trigger" basis).

| Name | Cash (Double Trigger) (1) | Cash (Single Trigger) (2) | Equity (3) | Perquisites / Benefits (4) | Subtotal | Non-qualified Deferred Compensation (5) | Total | CIC Reduction (6) |
|---|---|---|---|---|---|---|---|---|
| Carl L. Chapman | $6,331,500 | $ 496,718 | $10,890,705 | $ 33,016 | $17,751,938 | $ 13,884,901 | $31,636,839 | $ 2,500,046 |
| M. Susan Hardwick | $1,416,301 | $ 125,345 | $ 2,396,956 | $ 11,156 | $ 3,949,758 | $ 1,538,138 | $ 5,487,896 | $ 748,398 |
| Eric J. Schach | $1,928,925 | $ 178,437 | $ 3,349,641 | $ 30,343 | $ 5,487,346 | $ 825,248 | $ 6,312,594 | N/A |
| Ronald E. Christian | $1,599,071 | $ 141,520 | $ 2,475,168 | $ 19,682 | $ 4,235,441 | $ 759,701 | $ 4,995,142 | N/A |

(1) These double-trigger cash payments represent payments for severance under the applicable change in control agreement. Under the change in control agreements, if, during the period beginning on the change in control and continuing for two years thereafter, the NEO's employment is terminated by us (or our successor) other than for cause, death or disability, or the NEO resigns employment for good reason, then we (or our successor) will make a termination payment to the NEO based upon a multiple of base salary plus target annual incentive, which multiple is three for Mr. Chapman and two for all other NEOs.

(2) This single trigger cash payment represents the payment for the pro-rated bonus for the fiscal year of the merger for the efforts made for the portion of such year through the closing pursuant to the merger agreement.

(3) This single trigger payment represents the value of all unvested stock units and performance units (at target) that will vest and convert into a right to receive $72.00, in each case, as of the effective time pursuant to the merger agreement. As described under "The Merger Agreement—Treatment of Company Equity Awards", pursuant to the merger agreement, the performance units will vest at the greater of target or actual results; accordingly, the value of these payments could be greater than the amount reflected in the table.

(4) This double trigger amount represents the value of the continuation of medical, prescription, dental, and other welfare benefit plans for three years for Mr. Chapman and two years for all other NEOs pursuant to the change in control agreements.

(5) For each NEO other than Mr. Chapman, this amount represents a single trigger payment for the total value of the NEO's nonqualified deferred compensation plan accounts under the active plan, which represent previously earned compensation that such NEO elected to have accelerated and paid upon a change in control, which will be paid upon the effective time of the merger. For Mr. Chapman this amount represents a single trigger payment of $11,088,939 for the total value of his nonqualified deferred compensation plan accounts under the active plan that is payable in a lump sum upon the effective time of the merger and a double trigger payment of $2,795,962 for the total value of his nonqualified deferred compensation plan accounts under the frozen plan that is payable in a lump sum upon a termination at any time following a change in control and in each case such amounts represent previously earned compensation of Mr. Chapman. The NEOs other than Mr. Chapman also have accounts under the frozen nonqualified deferred compensation plan which will not be accelerated due to the merger (either on a single or double trigger basis) and are not included in these amounts.

(6) As described under "Additional Interests of the Company's Directors and Executive Officers in the Merger —Change in Control Agreements", pursuant to the change in control agreements, the total payment following a change in control will be reduced to a level below the Section 280G safe harbor amount if the NEO would receive a higher after-tax benefit than if the executive were to pay the applicable excise tax on the full payment amount. Under the assumptions above, Mr. Chapman and Ms. Hardwick exceed the 280G safe harbor amount and as a result their payments would be reduced below the safe harbor amount. The payments to Mr. Schach also exceed the Section 280G safe harbor amount, but Mr. Schach has a higher after-tax benefit by receiving the full payments and paying the applicable excise tax than reducing his payments. Under the above assumptions, it is estimated that Mr. Schach will owe an excise tax of $840,331 and the Company will be denied a tax deduction with respect to such excess parachute payments in an amount equal to $4,201,656. The payments to Mr. Christian do not exceed his Section 280G safe harbor amount; accordingly, the payments are not subject to the modified Section 280G cutback provision.

51.     Furthermore, as noted above, CenterPoint Energy agreed to maintain certain facilities and offices in Evansville and to appoint executive officers based in Evansville to oversee gas utility operations and the Company's electric business.

52.     Additionally, as noted above, the treatment of outstanding unvested performance-based equity-awards was an important aspect of the negotiations to the Defendants. On March 15, 2018, BofA Merrill Lynch provided bidders with a draft merger agreement which contemplated

that all outstanding unvested performance-based equity awards would be cashed out at closing using values based on *the greater of target and actual performance*. In the markup of the merger agreement CenterPoint Energy sent to the Company on April 6, 2018, CenterPoint Energy proposed that unvested outstanding performance-based equity awards be cashed out at *target valuation* upon closing. On April 10, 2018, Baker Botts sent a revised draft of the merger agreement to CenterPoint Energy that counter-proposed that all performance-based equity awards be cashed out at *the greater of target and actual performance*. As of April 13, 2018, the treatment of outstanding performance-based equity awards remained a key open issue. On April 16, 2018, CenterPoint Energy submitted a revised merger agreement with certain unspecified revised terms regarding equity awards for the Company's officers and employees. On April 21, 2018, Mr. Prochazka called Mr. Chapman to discuss the remaining open issues in the merger agreement. Following this discussion and after additional discussions among the Company's and CenterPoint Energy's counsel, Baker Botts provided to CenterPoint Energy and its counsel a revised form of merger agreement that reflected the resolution of all open items in the merger agreement. This draft provided that performance-based equity awards would be cashed out at *the greater of target and actual performance*, other than 2019 grants, if any were issued, which would be cashed out on a pro-rated basis based on target performance.

53.     Simply put, the treatment of equity awards for the Company's officers and employees was clearly a key issue for the Defendants and members of Vectren management, and they ultimately were able to largely obtain the treatment they desired.

## IV.     Background Information Concerning Vectren and its Valuation

54.     Vectren is an energy holding company headquartered in Evansville, Indiana. Its wholly owned subsidiary, Vectren Utility Holdings, Inc. ("VUHI"), serves as the intermediate

holding company for three public utilities: Indiana Gas Company, Inc. ("Indiana Gas"), Southern Indiana Gas and Electric Company ("SIGECO"), and Vectren Energy Delivery of Ohio, Inc. ("VEDO").  VUHI also has other assets that provide information technology and other services to the three utilities.  VUHI's consolidated operations are collectively referred to as the Utility Group. Both the Company and VUHI are holding companies as defined by the Energy Policy Act of 2005.

55.     Indiana Gas provides energy delivery services to approximately 603,000 natural gas customers located in central and southern Indiana.  SIGECO provides energy delivery services to approximately 146,000 electric customers and approximately 112,000 gas customers located near Evansville in southwestern Indiana.  SIGECO also owns and operates electric generation assets to serve its electric customers and optimizes those assets in the wholesale power market. Indiana Gas and SIGECO generally do business as Vectren Energy Delivery of Indiana.  VEDO provides energy delivery services to approximately 323,000 natural gas customers located near Dayton in west-central Ohio.

56.     Vectren is also involved in nonutility activities in two primary business areas: Infrastructure Services and Energy Services. Infrastructure Services provides underground pipeline construction and repair services. Energy Services provides energy performance contracting and sustainable infrastructure, such as renewables, distributed generation, and combined heat and power projects.  Enterprises also has other legacy businesses that have investments in energy-related opportunities and services and other investments.  All of the above is collectively referred to as the Nonutility Group.  Enterprises supports the Company's regulated utilities by providing infrastructure services.

57.     Accordingly, Vectren's overall business can be broken down into three distinct categories of services: electric utility, gas utility, and non-regulated.

58.     Given the diversity of these three distinct business segments all operating under the Vectren Corporation umbrella, BofA Merrill Lynch deemed it necessary to value each of Vectren's business segments separately to capture each segment's unique market, governmental, and regulatory influences.  They performed comparable companies and transactions analyses for each business segment individually and ran a separate DCF for each business segment.  To accomplish the business segment financial valuation, the Company's projections had to have been broken down by business segment—net income for gas, net income for electric, net income for non-regulated, EBITDA for gas, EBITDA for electric, EBITDA for non-regulated, free cash flow for gas, free cash flow for electric, free cash flow for non-regulated, etc. Additionally, the various valuation assumptions (pricing multiples, risk-based discount rates, etc.) were also derived and disclosed at the business segment level—a discount rate range for gas, a discount rate range for electric, a discount rate for non-regulated, etc.  However, the individualized Business Segment Projections were not disclosed to the Company's shareholders, despite the fact that such projections were clearly critical in order to properly value Vectren shares.

59.     Moreover, it appears that BofA Merrill Lynch used an inappropriately high discount rate in performing its Discounted Cash Flow Analysis. The average of the midpoints of the ranges provided in the Proxy on page 37 provides for a discount rate for Vectren of 6.4%. However, Bloomberg—through their subscription-based service—states that the discount rate for Vectren is actually 5.3%, as indicated below:



As discussed *infra*, this variation in discount rate could result in a tremendous difference in valuation.

60.     Vectren shareholders were impeded from recognizing and quantifying how much BofA Merrill Lynch misvalued their shares utilizing a flawed analysis, and were misled about the implied equity value for their shares, because the Vectren Cash Flow Projections and Business Segment Projections were not given to them.  If these projections had been disclosed, Vectren shareholders would have been able to determine that the implied equity value of their Vectren shares was higher than the range set forth on page 38 of the Proxy.  Without the actual Cash Flow Projections and the Business Segment Projections, all Vectren shareholders were given was a misleading conclusion that the implied equity value for their Vectren shares was significantly lower than Vectren's actual intrinsic value.

61.     Additionally, in March 2018, one month prior to the Merger announcement, analyst growth expectations for Vectren were strong according to the investor website Simply Wall Street. Vectren's earnings growth was expected to be in the teens in the upcoming years, indicating it had

a solid future ahead as a stand-alone entity. Such growth should presumably have led to robust cash flows, feeding into a higher share value.  Of course, the Company's Cash Flow Projections were withheld from shareholders, which in turn rendered the summary of BofA Merrill Lynch's Discounted Cash Flow Analysis misleadingly incomplete.

## V.     The Proxy Omitted Critical Financial Projections, Which Rendered the Summary of BofA Merrill Lynch's Valuation Analyses and Consolidated Projections Incomplete and Misleading

62.     On July 16, 2018, Vectren filed the Proxy with the SEC, which was mailed to Vectren shareholders on or about July 17, 2018.  The Proxy solicited the Company's shareholders to vote in favor of the Merger.  Defendants, as directors and/or officers of the Company, had a duty to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, as set forth herein, the Defendants breached that duty and were therefore negligent, as the omission of the Cash Flow Projections and the Business Segment Projections rendered specific portions of the Proxy misleadingly incomplete.

63.     It is not subject to serious challenge that information relating to the financial condition, solvency, and profitability of a company is plainly material to its shareholders. Complete and accurate financial projections are necessary for shareholders when deciding how to vote on a merger, because company managers have meaningful insight into their firms' futures that the market does not. Thus, complete and accurate projections speak directly to the question forced upon shareholders by a merger: does the merger consideration adequately compensate me for surrendering my shares and a future interest in the corporation?

64.     Therefore, when corporate actors voluntarily elect to speak regarding projections and valuation-related information, they assume an obligation to do so in a complete and accurate manner.  When it comes to disclosing projections and valuation information, a company may

choose silence or speech elaborated by the factual basis as then known—but it may not choose incomplete half-truths.  If one speaks on a topic, he is bound not only to state the truth but also not to withhold any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.  The selective disclosure of projections and valuation information is inherently misleading because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction.  Disclosing only a subset of available financial information, while withholding another subset of distinct financial information that alters the overall valuation picture created by the disclosed numbers, is misleading.

**A.** ***The Cash Flow Projections Were Material***

65.     Unlevered free cash flow projections are the single most important financial metric when valuing a company for sale.  For this reason, the disclosure of cash flow projections is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers.  In fact, in Vectren's most recent 10-K, Defendants acknowledge the importance of cash flows, referencing them 47 times throughout the filing.  However, here, Defendants conspicuously withheld any form of Vectren's readily available Cash Flow Projections from shareholders despite electing to include a table of projections on page 40 and incompletely "summarizing" BofA Merrill Lynch's Discounted Cash Flow Analysis.

66.     The primary projection metrics disclosed on page 40 (net income and EBITDA) *are not sufficient analogs for Cash Flow Projections*.[1] Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the

---

[1]     The summary does not even disclose the required information for shareholders to independently calculate cash flow projections.

company's projected future cash flows, not projected net income or EBITDA.[2] BofA Merrill

Lynch agrees, as indicated by their use of the Cash Flow Projections—not EBITDA or net

income—in performing their DCF analysis, and academics and practitioners concur. [3,4,5]

67.     There are fundamental differences between unlevered free cash flow and net

income.  A company's net income is a quite arbitrary figure obtained after assuming certain

accounting hypotheses regarding expenses and revenues.  On the other hand, free cash flow is an

objective measure, a single figure that is not subject to any personal criterion.[6] As a leading

financial expert explains:

> The classic definition of net income (revenues for a period less the expenses that
> enabled these revenues to be obtained during that period), in spite of its conceptual
> simplicity, is based on a series of premises that seek to identify which expenses
> were necessary to obtain these revenues. This is not always a simple task and often
> implies accepting a number of assumptions. Issues such as the scheduling of
> expense accruals, the treatment of depreciation, calculating the product's cost,
> allowances for bad debts, etc., seek to identify in the best possible manner the

---

[2]     Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[3]     "Morningstar's Approach to Equity Analysis and Security Valuation." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 305. ("We use a discounted cash flow (DCF) approach to arrive at our intrinsic value estimates because it allows us to separate economic reality from accounting-based noise.").

[4]     Copeland, Thomas. *Financial Theory and Corporate Policy*. 3rd ed. 24. ("The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does… Financial managers are frequently misled when they focus on the accounting definition of profit…").

[5]     Brealey, Richard, Stewart Myers, and Franklin Allen. "The Value of Common Stocks." *Principles of Corporate Finance*. 10th ed. New York: McGraw-Hill Irwin, 2011. 80. ("This discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows…. Notice that it is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share.") (emphasis in the original).

[6]     Pablo Fernández, *Cash flow is a Fact. Net income is just an opinion*, (October 17, 2008), http://csinvesting.org/wp-content/uploads/2015/02/Cash-Flow-vs.-NI.pdf,     also     found     as *Valuation Methods and Shareholder Value Creation*, Chapter 9 Cash Flow and Net Income, 2002 Academic Press, San Diego, CA.

quantity of resources that it was necessary to sacrifice in order to obtain the revenues. Although this "indicator", once we have accepted the premises used, can give us adequate information about how a company is doing, the figure obtained for the net income is often used without full knowledge of these hypotheses, which often leads to confusion.

"Free cash flow is accurate because it shows the cash coming in and the cash going out whereas with net income, one has to worry about accrual accounting, non-cash charges such as depreciation and most importantly, heavy manipulation. The main advantage that free cash flow has over earnings is that it can't be manipulated as much."[7] Simply stated, net income is an accounting number used for reporting purposes, but free cash flow is the actual amount of cash available to investors.

68.     Similarly, there are fundamental differences between unlevered free cash flow and EBITDA. EBITDA is not a sufficient alternative to unlevered free cash flows—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy."[8] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[9] As a result of these material differences between EBITDA and unlevered free cash flows, experts

---

[7]     David Thomas, *Why Free Cash Flow Is Better Than Earnings*, Shares and Stockmarkets, (July 29, 2013), https://sharesandstockmarkets.com/free-cash-flow-v-earnings/.

[8]     Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[9]     Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

69.     In sum, the Cash Flow Projections were plainly material information which Defendants erred in omitting from the Proxy, especially since they were readily available and utilized by the financial advisor to value the Company.

### B. *The Business Segment Projections Were Material*

70.     As discussed above, although all under the Vectren umbrella, the Company has three distinct business lines that are each subject to their own independent regulatory and market influences.  But perhaps more important to Vectren shareholders, BofA Merrill Lynch valued each segment of the Company independently. All three of BofA Lynch's valuation analyses—the *Selected Publicly Traded Companies Analysis*, the *Selected Precedent Transactions Analysis*, and the *Discounted Cash Flow Analysis*—utilized the Business Segment Projections, not the Consolidated Projections provided in the summary on page 40.  In fact, it appears that the Consolidated Projections were essentially ignored by the financial advisor.

71.     The exclusive use of the Business Segment Projections by BofA Merrill Lynch indicates that they, not the Consolidated Projections on page 40 of the Proxy, are the projections required to properly assess the fairness of the Merger Consideration and value of the Company. Further, all the various valuation assumptions (pricing multiples, risk-based discount rates, etc.) were provided on a business segment basis. Hence, without the Business Segment Projections, it was literally impossible for shareholders to value their shares according to the approach favored by Defendants' own financial advisor, or even check that BofA Merrill Lynch's inputs and assumptions were reasonable.  By lumping each of the separate segment projections into the

consolidated summary on page 40, the Proxy skews the financial picture of the Company and prevents shareholders from seeing the effect of each set of independent influences.

72.     In sum, the financial analyses performed by BofA Merrill Lynch clearly demonstrate that the most reliable and appropriate method of valuing the company was through the use of three separate business segments.  To enable such a valuation, Defendants furnished BofA Merrill Lynch with the Business Segment Projections, but withheld them from shareholders. This constitutes a material omission.

## VI.   The Omission of the Cash Flow Projections and Business Segment Projections Rendered the Following Portions of the Proxy Misleadingly Incomplete

### A. *The Misleading Summary of BofA Merrill Lynch's Discounted Cash Flow Analysis*

73.     First, the omission of the Cash Flow Projections and the Business Segment Projections rendered the "summary" of BofA Merrill Lynch's Discounted Cash Flow Analysis on page 37-38 of the Proxy misleadingly incomplete.  As set forth herein, BofA Merrill Lynch could not have performed its Discounted Cash Flow Analysis in the manner that it did without separate Unlevered Free Cash Flow Projections for each business segment.  Further, as set forth above, it appears that BofA Merrill Lynch utilized high discount rates in conducting this analysis, and thus, the resulting implied per share equity value reference range on page 38 did not accurately reflect the value of Vectren shareholders' shares.  However, because the Cash Flow Projections and Business Segment Projections were omitted, Vectren shareholders were unable to properly assess and quantify how off base the misleadingly low equity value reference range was.  And, as set forth below, even a minor change to the discount rate would have a significant impact on the resulting valuation.  Simply put, a so-called "summary" of a valuation analysis is misleading if underlying assumptions or key inputs are omitted, particularly when shareholders are impeded

from recognizing how significantly undervalued their shares are as compared to the "implied" valuation range they have been given because of the omission.

74.     To support their fairness opinions, financial advisors perform several types of valuation analyses.  Here, BofA Merrill Lynch performed a Selected Publicly Traded Companies Analysis, a Selected Precedent Transactions Analysis, and a Discounted Cash Flow Analysis. Proxy at 34-38.  Each of these analyses are highly subjective and prone to manipulation to ensure the desired outcome—that the merger consideration and transaction at issue appear "fair" to shareholders.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions:

> A fairness opinion's worth ultimately lies in the reliability and accuracy of its underlying valuation analyses. This is the realm of finance - and academics have made significant strides in the previous decades to develop techniques by which a theoretically reliable range of values can be achieved. However, there is still an element of subjectivity present in the choice and application of these methods. **The end-result is to provide the preparer discretion to effect the outcome of a valuation and a diminished ability for outsiders to make comparative assessments of analyses**.

> There are a number of different underlying valuation analyses upon which a fairness opinion can rest. The most common and accepted techniques are discounted cash flow, comparable companies, premium, break-up, and liquidation analysis. The preparer of a fairness opinion will typically utilize a weighted combination of these to arrive at a fairness conclusion. The choice of a particular analysis to employ and the weight given to each is partially subjective and depends upon the asset being valued and the relevant circumstances. **For example, in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus**. However, in the investment banking community, there are no uniform, specific, and objective guidelines as to the exact mix and weight to assign to each of these methods to arrive at fairness.

> Each of the techniques in and of themselves is also prone to subjectivity. **For example, a discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which**

27

**must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**. However, again there is no standard-setting or other body guiding these or other preparation decisions. Rather, a discounted cash flow analysis, like other valuation analyses, is typically compiled using historically developed and unguided industry practices as influenced and first put forth by academic practitioners. This lends itself to differences in valuation approach in each application and among institutions as each of them develops their own individual approach. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.

**This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness**. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1573-78 (2006).

75.     Here, BofA Merrill Lynch performed a sum-of-the-parts DCF analysis of Vectren, which consisted of discrete valuations of the Company's distinct business segments (*i.e.*, its gas utility business, electric utility business, and non-regulated businesses) and summing the indicated values.  Separate discount rates, terminal pricing multiples, and net debt were determined for each business segment, as illustrated by the figure below. This is only possible if separate unlevered free cash flow projections exist for each business segment.

| Business Segment | Terminal Multiples: | | Discount Rate |
|---|---|---|---|
| | Range | Basis | |
| Gas Utility Business | 17.5x - 19.5x | EPS | 5.0% - 5.8% |
| Electric Utility Business | 15.3x - 17.3x | EPS | 4.7% - 5.4% |
| Non-regulated Businesses | 8.0x - 9.0x | EBITDA | 7.8% - 9.6% |

*EPS = earnings per share; EBITDA = earnings before interest, taxes, depreciation, and amortization*

*Source: Merger Proxy, p. 37*

76.     As indicated above, it appears that BofA Merrill Lynch used an inappropriately high discount rate for their DCF. The difference between a 5.3% discount rate (the Bloomberg rate) and a 6.4% discount rate (the average of the midpoints provided on page 37 of the Proxy) has a material impact on the resulting valuation.  Assuming zero growth rate, [10] this difference in discount rates (1.1% or 110 basis points) could result in a 20% difference in valuation—and that effect would be larger still with higher assumed rates of growth.  Considering Vectren's 83,000,000 shares outstanding, the multiplied effect of this change could represent the difference in hundreds of millions of dollars.  By any meaningful standard, such large differences are clearly material.

77.     Exacerbating the financial ambiguity, unlike BofA Merrill Lynch's sum-of-the-parts DCF, the Company's financial projections were provided only on a consolidated basis, without breaking out the financial details by business segment.  Furthermore, as noted earlier, Free Cash Flow Projections (the most important projected metric to understanding a discounted cash flow analysis) were not provided at all—not even on a consolidated basis. By mismatching the *business segment* information that formed the basis of BofA Merrill Lynch's fairness opinion and management's *Consolidated* Projections disclosed in the Proxy, Defendants could hardly have done a better job of obfuscating BofA Merrill Lynch's financial analyses, even had they deliberately set out to do so.

78.     As noted on page 34 of the Proxy, "[c]onsidering the data set forth in the tables below without considering the… assumptions underlying the analyses, could create a misleading or incomplete view of the financial analyses performed by BofA Merrill Lynch."  The Cash Flow

---

[10]     Well below management's expectations of 6% to 8% growth over the next several years. Proxy at 16 ("Company management believes that the Company's current strategic plan is capable of delivering 6% to 8% growth in the Company's earnings per share over the next several years.").

Projections—on a business segment basis—were the *primary* assumption used by BofA Merrill Lynch.  The failure to provide the financial projections that aligned with the valuation analyses prepared by the Company's own financial advisor in the Proxy therefore did, in fact, create a misleading and incomplete view of the financial analyses performed by BofA Merrill Lynch and the resulting implied valuation ranges.

79.     Simply stated, one cannot properly assess and recognize the legitimacy or lack thereof of a financial advisor's fairness opinion valuation analyses unless the key financial metrics and inputs associated with the analyses are disclosed.  Here, the Defendants allowed the Proxy to incompletely and misleadingly "summarize" BofA Merrill Lynch's valuation analyses.  The summary of BofA Merrill Lynch's Discounted Cash Flow Analysis on pages 37-38 of the Proxy was materially incomplete and misleading, because it failed to disclose the key inputs that were necessary for Vectren shareholders to fully recognize the illegitimacy of the analyses and assess how off-base the misleadingly low resulting implied equity value was.

**B.** ***The Misleading Summary of Vectren's Financial Projections***

80.     Defendants elected to summarize Vectren's financial projections on page 40 of the Proxy, but they excised and failed to disclose the most important projections—the Cash Flow Projections and the Business Segment Projections.

81.     As stated above, the Consolidated Projections summarized on page 40 were not even used by BofA Merrill Lynch in any of the valuation analyses disclosed. Therefore, the Consolidated Projections cannot by any objective measure be considered a fair summary of the key inputs utilized by BofA Merrill Lynch for its valuation analyses.  It strains all credibility to claim that disclosing a set of projections that a financial advisor entirely set aside for other sets of more accurate and relevant financial projections constitutes complete and accurate disclosure.  For

these reasons, omitting the Business Segment Projections and limiting the disclosure of the Company's financial projections to only the Consolidated Projections in the Proxy was inexplicable, inappropriate, and misleading.

82.     Furthermore, the omission of the Free Cash Flow Projections rendered the projection tables on page 40 of the Proxy incomplete and misleading because, without the Cash Flow Projections, the summary of Consolidated Projections provided a misleading overall valuation picture of Vectren.  In light of the significant differences, as discussed in detail above, between unlevered free cash flow on the one hand, and the projected metrics that Defendants elected to disclose in the Proxy—net income and EBITDA—the table of projections on page 40 of the Proxy presented a misleadingly incomplete overall valuation picture of Vectren.  By failing to include the Cash Flow Projections, the table provides an obfuscated valuation picture of the Company.  Simply put, unlevered free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

83.     In sum, the omission the of the Cash Flow Projections and the Business Segment Projections rendered the summary of BofA Merrill Lynch's Discounted Cash Flow Analysis and the Consolidated Projections provided in the Proxy incomplete and misleading, in contravention of the Exchange Act.  The materially incomplete and misleading Proxy was an essential link in the forthcoming Merger, as the Merger could not be consummated without shareholder approval, which in turn could not have been obtained without the misleading Proxy.

## CLASS ACTION ALLEGATIONS

84.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Vectren common stock who are being harmed by Defendants' actions described below (the "Class").  Excluded from the Class

are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

85.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable.  As of the record date, July 11, 2018, Vectren had 83,080,695 common shares outstanding. held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Vectren will be ascertained through discovery;

(b)    There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

      i.  Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

     ii.  Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

   iii.  Whether Plaintiffs and the other members of the Class suffered damages as a result of being compelled to vote for the Merger based on the materially incomplete and misleading Proxy;

(c)    Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class;

(d)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(e)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

**On Behalf of Plaintiffs and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

86.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

87.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

88.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

89.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

90.     Defendants issued the Proxy with the intention of soliciting shareholder support for the Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy and

the use of their name in the Proxy, which contained multiple misleading summaries and omitted critical information regarding the Company's financial projections and BofA Merrill Lynch's valuation analyses.

91.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

92.     Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for Vectren and the details surrounding discussions with other interested parties and the BofA Merrill Lynch.  Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review BofA Merrill Lynch's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

93.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully.  Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of Vectren's financial projections.

94.     Each Individual Defendant was negligent as explained below:

i.     Individual Defendant Carl L. Chapman was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

ii.     Individual Defendant Derrick Burks was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy

despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

iii.     Individual Defendant James H. DeGraffenreidt, Jr. was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

iv.     Individual Defendant John D. Engelbrecht was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

v.     Individual Defendant Anton H. George was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and

BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

vi.     Individual Defendant Robert G. Jones was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

vii.    Individual Defendant Patrick K. Mullen was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

viii.   Individual Defendant R. Daniel Sadlier was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders

and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

ix.     Individual Defendant Michael L. Smith was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

x.     Individual Defendant Teresa J. Tanner was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

xi.     Individual Defendant Jean L. Wojtowicz was negligent because, as a member of the Board, he reviewed the financial analyses and fairness opinion with BofA Merrill Lynch, was aware of the existence of the Cash Flow Projections and the Business Segment

Projections, knew or should have known that such projections were material to the Company's shareholders and necessary for them to properly assess the purported fairness of the Merger Consideration and BofA Merrill Lynch's valuation analyses, and he nevertheless approved the dissemination of the Proxy despite the fact that it omitted such material information and contained the above-referenced misleading statements and summaries.

95.     Vectren is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

96.     As a direct and proximate result of the dissemination of the misleading Proxy Defendants used to obtain shareholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares prior to the Merger) in an amount to be determined at trial.  By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### On Behalf of Plaintiffs and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

97.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

98.     The Individual Defendants acted as controlling persons of Vectren within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Vectren, and participation in and/or awareness of the Vectren's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or

indirectly, the decision making of Vectren, including the content and dissemination of the statements that Plaintiffs contends are materially incomplete and misleading.

99.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Vectren, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Merger. The Proxy at issue contains the unanimous recommendation of the Board to approve the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

101.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

102.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

103.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these

defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the dissemination of the misleading Proxy Defendants used to obtain shareholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares prior to the Merger) in an amount to be determined at trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

B. Awarding Plaintiffs and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C. Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: October 29, 2018

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
         mschreiner@monteverdelaw.com

*Counsel for Lead Plaintiffs Kuebler and
Danigelis and Lead Counsel for the Putative
Class*

**ADEMI & O'REILLY, LLP**
Guri Ademi
Shpetim Ademi
3620 East Layton Ave.
Cudahy, WI 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
E-mail: gademi@ademilaw.com
         sademi@ademilaw.com

*Counsel for Lead Plaintiffs Kuebler and
Danigelis and Lead Counsel for the Putative
Class*

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, NY 10036
Tel.: (212) 682-3025
Fax: (212) 682-3010

*Counsel for Lead Plaintiff Nisenshal and Lead
Counsel for the Putative Class*

Respectfully submitted,

*/s/ Jason A. Shartzer*
Jason A. Shartzer, Atty. No. 23989-49

**SHARTZER LAW FIRM, LLC**
156 E. Market Street
10th Floor, Suite 1000
Indianapolis, IN 46204
(317) 969-7600
(317) 969-7650 Fax
Email: jshartzer@shartzerlaw.com

*Local Counsel for Lead Plaintiffs and the
Putative Class*